The SUPERIOR OIL COMPANY, a Nevada Corporation; and Arapaho Petroleum Inc., a Colorado Corporation, Plaintiffs,

v.

The UNITED STATES of America; the Department of the Interior of the United States; William P. Clark, Acting Secretary Designate of the Interior; Kenneth Smith, Assistant Secretary of the Interior for Indian Affairs; John Fritz, Deputy Assistant Secretary of the Interior for Indian Affairs for operations; Robert F. Buford, Director of Bureau of Land Management; Gene Sheldon, District Manager, Bureau of Land Management; Mat N. Millenbach, Area Manager, Bureau of Land Management; Bureau of Indian Affairs, an agency of the United States; Donald Dodge, Navajo Area Director, Bureau of Indian Affairs; the Navajo Tribe of Indians; the Navajo Tribal Council; Navajo Office of Mineral Development or its successor; Peterson Zah, individually, and as Chairman of the Navajo Tribal Council; Edward T. Begay, individually, and as Vice Chairman of the Navajo Tribal Council; Aktar Zamon, individually, and as director of the Navajo Mineral Department; and Alfred Dehiya, individually, and as Director of the Navajo Land Development Office, Defendants.

No. C–82–0751J.

United States District Court, D. Utah, C.D.

Jan. 29, 1985.

Arthur H. Nielsen, Thomas Jepperson, Robert L. McIntyre, Salt Lake City, Utah, for plaintiffs.

Joseph Anderson, Asst. U.S. Atty., William R. McConkie, Salt Lake City, Utah, Louis Denetsosie, Navajo Nation Dept. of Justice, Window Rock, Ariz., Kevin N. Anderson, Salt Lake City, Utah, for defendants.

JENKINS, Chief Judge.

The defendants' Motions to Dismiss the Amended Complaint and the defendants' Motion for Summary Judgment were argued orally on March 16, 1984. Arthur H. Nielsen, Thomas Jepperson, and Robert L. McIntyre represented the plaintiffs; Joseph Anderson and William W. McConkie represented the United States defendants; and Louis Denetsosie and Kevin N. Anderson represented the Navajo defendants. After due consideration of the oral arguments and the memoranda submitted by the parties, the court enters this Memorandum Opinion.

The defendants' motions raise a series of questions to the sovereign immunity of the

Navajo Tribe and the jurisdiction of this court. Certain oil and gas leases between the plaintiffs or their predecessors and the Tribe on land within the Navajo reservation form the subject matter of the action.

The plaintiffs allege in Count I of the Amended Complaint that the Tribe, as lessor, executed an oil and gas lease with the plaintiff Arapaho Petroleum, Inc. (Lease No. 5184). The Secretary of the Interior then approved that lease according to the terms of the Omnibus Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g (1976). Arapaho designated The Superior Oil Company as its "operator and local agent" to act on Arapaho's behalf. Amended Complaint, at ¶ 39 (filed November 15, 1983).

Thereafter, Superior performed seismic and other geophysical studies on the lands covered by the lease. Superior then obtained approval to drill a well from the Tribe and the Department of the Interior. However, before drilling the well, Superior requested the Tribe and the Bureau of Indian Affairs to reissue a seismic permit to allow Superior to determine more accurately the best location for the proposed well.[1] Neither the Tribe nor the Bureau of Indian affairs has acted on the requests. The plaintiffs allege that the Navajo defendants have expressed a desire to have lease No. 5184 expire so that the Tribe could negotiate a new lease with a higher royalty and bonus. In addition, the plaintiffs claim that the Navajo defendants have informed Superior that they would take every action possible to see that the lease would expire. Amended Complaint, at 10–18.

In Count II of the Amended Complaint, the plaintiffs allege similar facts regarding lease No. 5299, which was executed by Gulf Oil Corporation as the lessee. Gulf also designated Superior as its operator and local agent. Superior then requested a seismic permit from the Tribe and from the Bureau of Indian Affairs. Not long thereafter, Gulf assigned the lease to Superior,

and Superior requested that the Tribe and the Bureau of Indian Affairs approve that assignment. Neither the federal government nor the Navajo defendants have acted on either the request for a seismic permit or the request for approval of the assignment. The plaintiffs allege that the Navajo defendants have refused to act on the requests so that lease No. 5299 would expire and the Tribe could negotiate a new lease with a higher royalty and bonus. Amended Complaint, Count II, at 19–20.

In Count III of the Amended Complaint, the plaintiffs allege that Superior has received various other assignments of oil and gas leases as well as assignments of operating rights that pertain to oil and gas leases. Superior requested both the Bureau of Indian Affairs and the Tribe to approve the various assignments. However, Superior alleges, the Navajo defendants have refused to act on the requests; and, as a result of that refusal, the Plaintiffs have been deprived of property rights without due process of law or equal protection under the law in violation of the Indian Civil Rights Act, 25 U.S.C. § 1302 (1976).

The Tribe asserts that it is immune from suit and thus this court lacks jurisdiction over the Tribe. The Tribe further asserts that its immunity extends to the Navajo Tribal Council (the Tribe's governing body) and to the Navajo Office of Mineral Development (an agency of the Tribe responsible for the development of the Tribe's mineral resources). The Tribe also claims that its immunity prevents this court from exercising jurisdiction over a case involving the following individual Navajo defendants, in either their official or personal capacities: Peterson Zah, Chairman of the Tribal Council; Edward T. Begay, Vice Chairman of the Tribal Council; Alfred DeHiya, Director of the Navajo Land Development Office; and Aktar Zamon, Director of the Navajo Mineral Department.

After considering the oral arguments, and after reviewing the extensive memo-

---

1. The request was made on or about March 26, 1982. The lease provided for a termination on February 23, 1983. However, the term of the lease would be extended so long as minerals were produced in paying quantities.

randa filed in this case, the court has determined that it has no jurisdiction, that the defendants' motion for summary judgment should be granted, and that the plaintiffs' complaint should be dismissed.

## I. SOVEREIGN IMMUNITY OF THE NAVAJO TRIBE

■ That the Navajo Tribe is immune from certain suits is beyond dispute. "Indian Tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). *See also, Puyallup Tribe, Inc. v. Department of Game of Washington,* 433 U.S. 165, 172–73, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977); *United States v. United States Fidelity and Guaranty Co.,* 309 U.S. 506, 512–13, 60 S.Ct. 653, 656–57, 84 L.Ed. 894 (1940). *See generally,* F. Cohen, Handbook of Federal Indian Law 324–28 (1982 ed.). However, immunity from suit is not absolute. It is subject to complete defeasance by an act of Congress. *Santa Clara,* 436 U.S. at 58, 98 S.Ct. at 1677. The tribe itself can also waive its immunity. *Merrion v. Jicarilla Apache Tribe,* 617 F.2d 537, 540 (10th Cir. 1980), aff'd, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982).

The plaintiffs assert three separate bases for congressional extinguishment. First, they argue that Congress' exercise of plenary control over oil and gas operations through the passage of the Omnibus Indian Mineral Leasing Act, 25 U.S.C. §§ 396a–396g (1976), extinguished the Tribe's immunity from suit. Second, they claim that Congress extinguished the Tribe's immunity by passing the Indian Civil Rights Act, 25 U.S.C. §§ 1301–03 (1976). Finally, the plaintiffs assert that the immunity insulates the Tribe only from an action for money damages, and does not insulate the Tribe from an action for injunctive and declaratory relief.[2] Each of these claims is without merit.

■ First, the Omnibus Indian Mineral Leasing Act did not diminish the Tribe's sovereign immunity. The Supreme Court stated in *Santa Clara* that "a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" 436 U.S. at 58, 98 S.Ct. at 1677, quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). Because nothing on the face of the Act indicates a congressional extinguishment of the Tribe's immunity, the Act does not affect the Tribe's sovereign immunity.

■ Second, the Indian Civil Rights Act did not diminish the Tribe's sovereign immunity. The Supreme Court's opinion in *Santa Clara* is dispositive of this issue as well. The Court in *Santa Clara* specifically concluded that the Indian Civil Rights Act did not extinguish the Tribe's sovereign immunity. 436 U.S. at 59, 98 S.Ct. at 1677.

■ The plaintiffs rely on an exception to *Santa Clara* that the Tenth Circuit created in *Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes,* 623 F.2d 682 (10th Cir.1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981) (*Dry Creek II*). In *Dry Creek,* the plaintiffs alleged violations of their rights of due process and equal protection as guaranteed by the Indian Civil Rights Act. *See Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 932–36 (10th Cir.1975) (*Dry Creek I*). The district court dismissed the original complaint for lack of jurisdiction because of sovereign immunity. On appeal, after concluding that the Indian Civil Rights Act waived the Tribe's sovereign immunity, the Tenth Circuit remanded the case for trial. *Id.*

While the case was in the district court on remand, the Supreme Court handed down its decision in *Santa Clara.* The district court then dismissed the case in

---

2. The plaintiffs also claim that the Tribe's sovereign immunity does not protect it when it is engaged in a commercial, rather than a governmental, enterprise. The Supreme Court has not hesitated to apply the immunity in cases involving mineral leases. *See Fidelity and Guarantee,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894.

reliance on *Santa Clara. See, Dry Creek II,* 623 F.2d at 683. Again the Tenth Circuit reversed. In *Dry Creek,* the plaintiffs had been denied access to the tribal courts. The Tenth Circuit distinguished the Supreme Court's opinion in *Santa Clara* on that basis. *Id.* at 685. The court concluded that when the Tribe denies access to its courts, the limitations and restrictions of *Santa Clara* should not be applied.

In the present case, the plaintiffs assert that they have no tribal court remedy. However, they have not alleged any attempt to pursue a tribal court remedy; they allege only that it would be futile to do so. They suggest that their earlier dealings with Indian officials regarding the leases indicate that any attempt to use the tribal courts would lead only to frustration and delay.

The Tenth Circuit addressed a similar argument in *White v. Pueblo of San Juan,* 728 F.2d 1307 (10th Cir.1984). The plaintiffs in *White* argued that it was sufficient to allege that tribal court remedies would be insufficient. The Tenth Circuit disagreed:

> The rationale behind the holding of the Tenth Circuit in *Dry Creek* was based upon what the court regarded as absolute necessity.... Necessarily the *Dry Creek* opinion must be regarded as requiring narrow interpretation in order not to come into conflict with the decision of the Supreme Court in *Santa Clara.* Accordingly, the *Dry Creek* decision ought to be interpreted to provide a narrow exception to the traditional sovereign immunity bar from suits against Indian tribes in federal courts. In addition, to adhere to the principles of *Santa Clara,* the aggrieved party must have actually sought a tribal remedy, not merely alleged its futility. This is not merely a requirement that the exhaustion of tribal remedies is a prerequisite to federal jurisdiction, but instead, that tribal remedies, if existent, are exclusive.

*Id.* at 1312. *See also, Jicarilla Apache Tribe v. Andrus,* 687 F.2d 1324, 1345–46 (10th Cir.1982).

The plaintiffs have made no actual attempt to obtain a tribal court remedy. They chose instead to pursue this action in federal court, alleging that such an attempt would be futile. "But this is not the law of the Tenth Circuit; speculative futility is not enough to justify federal jurisdiction. The tribal remedy must be shown to be nonexistent by an actual attempt before a federal court will have jurisdiction." *Id.* at 1313. The Tribe argues strenuously that a tribal forum is available to the plaintiffs. Because the plaintiffs have not shown through an actual attempt that tribal court remedies are not available, *Dry Creek* provides no support for their position.

■ The plaintiffs' final argument with respect to the Tribe is that even if the Tribe possesses common law immunity from suit for monetary damages, that immunity does not extend to an action for injunctive or declaratory relief. This court disagrees. The Supreme Court in *Santa Clara* held unequivocally that "suits against the tribe under the ICRA are barred by its sovereign immunity from suit." 436 U.S. at 59, 98 S.Ct. at 1677. Although the Court did consider whether it possessed jurisdiction to grant specific relief, the Court considered that issue only as it related to the officers of the Tribe. The Tribe itself was dismissed because of sovereign immunity.

The court concludes from *Santa Clara* that sovereign immunity means immunity from injunctive as well as monetary relief. Although Congress could extinguish or the Tribe could waive the Tribe's immunity, neither has done so. Accordingly, the complaint against the Navajo Tribe of Indians must be dismissed.

■ Similarly, the complaint against the Navajo Tribal Council and the Navajo Office of Mineral Development must be dismissed. Those two entities are merely parts of the Tribal government. Relief against them would be, in effect, relief against the Tribe. *See Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S.

682, at 688, 69 S.Ct. 1457, at 1460, 93 L.Ed. 1628 (1949).

## II. SOVEREIGN IMMUNITY OF THE TRIBAL OFFICIALS

■ The plaintiffs assert that even if the Tribe has sovereign immunity, that immunity does not extend to the Tribal officials. *See Santa Clara*, 436 U.S. at 59, 98 S.Ct. at 1677. However, any action that seeks to enjoin Tribal officials acting in representative capacities raises the possibility that relief granted against the officials would, in effect, be relief granted against the Tribe. *Larson*, 337 U.S. at 688, 69 S.Ct. at 1460; *see also, Tenneco Oil Co. v. Sac & Fox Tribe of Indians of Oklahoma*, 725 F.2d 572, 576 (10th Cir.1984) (McKay, concurring). If that is the purpose of the action, the suit is barred by the Tribe's sovereign immunity. On the other hand, if the officer acts beyond his authority, the suit is against the officer in his individual capacity and the Tribe's immunity does not protect him.[3] *Larson*, 337 U.S. at 688, 69 S.Ct. at 1460; *Tenneco Oil*, 725 F.2d at 574; *cf., Ex party Young*, 209 U.S. 123, 155–56, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908).

The plaintiffs urge at this point that the individual defendants have each acted outside his authority. Their argument is two-pronged. First, they argue that the Tribe does not have the sovereign power to authorize someone to approve or disapprove permits or assignments, and, consequently, any Tribal power granted to the individual defendants to do so is void. Second, they argue that even if the Tribe had the sovereign power to grant such authority, the Tribe did not bestow that authority on the individual defendants.

### A. The Scope of Tribal Sovereignty.

■ The powers of Indian tribes are derived from the tribes' sovereign exist-ence before the coming of the Europeans. Those powers are "inherent powers of a limited sovereignty which has never been extinguished." *United States v. Wheeler*, 435 U.S. 313, 322, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978), quoting F. Cohen, Handbook of Federal Indian Law 122 (1945) (emphasis deleted). However, the tribes'

> incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. By specific treaty provision they yielded up other sovereign powers; by statute, in exercise of its plenary control, Congress has removed still others.
>
> But our cases recognize that Indian tribes have not given up their full sovereignty. ... The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*Id.* at 323, 98 S.Ct. at 1086. *See also Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209–10, 98 S.Ct. 1011, 1021–22, 55 L.Ed.2d 209 (1978) (tribal courts do not have criminal jurisdiction over non-Indians because such an exercise of tribal sovereignty would be inconsistent with the tribe's dependent status). *See generally,* F. Cohen, Handbook of Federal Indian Law 229–57 (1982 ed.).

■ *1. Tribal Sovereignty Has Not Been Diminished By Statute or Treaty.* The plaintiffs argue that Congress, in enacting the Omnibus Indian Mineral Leasing Act, 25 U.S.C. §§ 396a–396g, withdrew the Tribe's sovereignty to grant seismic per-

---

**3.** At least two courts have indicated that when officials act beyond the scope of tribal powers, the tribe's immunity does not bar suit against the tribe. *Snow v. Quinault Indian Nation,* 709 F.2d 1319, 1321 (9th Cir.1983); *Swift Transpor-* *tation, Inc. v. John,* 546 F.Supp. 1185, 1188 (D.Ariz.1982). Because the court finds that the Tribe had sovereign power to authorize the officials to do the acts complained of, the court does not need to reach this issue.

mits and to approve assignments of leases and operating rights. The plaintiffs make what is essentially a preemption argument. They assert that the Act and the regulations promulgated by the Secretary of the Interior pursuant to section 396d of the Act are so comprehensive that they preempt tribal attempts to regulate oil and gas leases.

The Supreme Court addressed this argument in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982). The petitioners in *Merrion* opposed a severance tax imposed by the Tribe on certain oil and gas leases. The petitioners argued that the Omnibus Indian Mineral Leasing Act preempted regulation of the leases by the tribe, and, therefore, the tribe did not have the authority to impose a severance tax. The Supreme Court disagreed. The Court held that the Act did not preempt tribal regulation and it did not prevent the Tribe from imposing the tax. *Id.* at 150, 102 S.Ct. at 908. Although the Supreme Court's holding seems to rest on the premise that the tribe be organized and incorporated pursuant to 25 U.S.C. §§ 476 and 477, the Tenth Circuit has ruled to the contrary. *Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486 (10th Cir.1983). The inescapable result of *Merrion* and *Southland* is that the Omnibus Indian Mineral Leasing Act did not preempt all tribal attempts to regulate mineral leases. *See also, Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 372–76, 88 S.Ct. 982, 985–87, 19 L.Ed.2d 1238 (1968) (Regulations promulgated by the Secretary of the Interior do not deprive Indians of standing to sue under a lease).[4]

The plaintiffs argue that even if the Act did not preempt all Tribal regulation of oil and gas leases, the Tribe's regulations directly conflict with specific regulations promulgated by the Secretary of the Interior.[5] Congress provided in the Omnibus Indian Mineral Leasing Act that "All operations under any oil, gas, or other mineral lease issued pursuant to the terms of section 396a to 396g of this title or any other Act affecting restricted Indian lands shall be subject to the rules and regulations promulgated by the Secretary of the Interior." 25 U.S.C. § 396d (1983). Pursuant to that authority, the Secretary of the Interior has promulgated regulations that apply to mineral leases on tribal property. *See,* 43 C.F.R. Parts 3160 and 3180 (1983); 25 C.F.R. Parts 211 and 212 (1984).

In particular, the plaintiffs point to 25 C.F.R. § 211.20 (1984), which provides in pertinent part as follows:

(a) No operations will be permitted on any lease before it is approved by the Secretary of the Interior.

(b) Written permission must be secured from the supervisor before any operations are started on the leased premises. After such permission is secured the operations must be in accordance with the operating regulations promulgated by the Secretary of the Interior.

---

4. In *Rainbow Resources, Inc. v. Calf Looking*, 521 F.Supp. 682 (D.Mont.1981), the district court held that "In the exercise of its superior and plenary control, Congress has chosen to grant exclusive authority for the regulation, administration and supervision of oil and gas leases on lands alloted to individual Indians to the Secretary of the Interior." *Id.* at 684 (relying on 25 U.S.C. §§ 396 and 396d). *Rainbow Resources* is inapposite here. That case involved a tribal judge's attempt to enjoin an action that a federal regulation required. In this case, there is no such direct conflict between tribal sovereignty and federal regulation. Moreover, that case involved individual allotees, not tribal lands.

5. The plaintiffs' argument assumes that by delegating to the Secretary of the Interior the authority to promulgate rules concerning mineral leases, Congress also delegated to the Secretary the authority to waive tribal sovereignty to the extent that tribal sovereignty might conflict with the Secretary's regulations. The Supreme Court has admonished that "a proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative intent." *Santa Clara*, 436 U.S. at 60, 98 S.Ct. at 1678. However, because the court finds that there is no actual conflict between tribal regulation and the regulations promulgated by the Secretary of the Interior, the court need not reach this issue.

The plaintiffs argue that this regulation directly conflicts with any attempt by the Tribe to require a lessee to obtain a seismic permit from the Tribe. The plaintiffs further argue that this regulation directly conflicts with the Tribe's position that no assignment of operating rights and no assignment of a lease is effective unless approved by the Tribe.

These arguments are without merit. Section 211.20 requires only that the lessee comply with federal regulations. It does not purport to prohibit a tribe from requiring a lessee to obtain a permit issued by the tribe before the lessee can enter the reservation to perform seismic tests. It does not purport to prohibit a tribe from requiring tribal approval of assignments of leases or operating rights. In short, nothing in the regulation prohibits something Navajo Tribal regulations require; nothing in the regulation requires something Navajo Tribal regulations prohibit. Absent such a direct conflict, this court is reluctant to find that Congress, by authorizing the Department of the Interior to promulgate rules, has limited an Indian Tribe's sovereignty.

Accordingly, neither Congress, by passing the Omnibus Indian Mineral Leasing Act, nor the Department of the Interior, by promulgating rules pursuant to that Act, has limited the Navajo Tribe's sovereignty to approve assignments of leases and operating rights and to require a lessee to obtain a seismic permit issued by the Tribe. Congress has not impaired the Tribe's sovereignty to regulate who can enter the reservation and for what purpose.[6]

*2. Tribal Sovereignty Has Not Been Diminished By Its Dependent Status.* It is next necessary to determine whether the Tribe's sovereignty is limited "by implication as a necessary result of [its] dependent status." *Wheeler,* 435 U.S. at 323, 98 S.Ct. at 1086. The Supreme Court has found tribal sovereignty to be so limited in cases "where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government." *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 153, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). For example, the Court has found a divestiture of tribal sovereignty when the tribes seek to engage in foreign relations, when they alienate their lands to non-Indians without federal approval, or when they prosecute non-Indians in tribal criminal courts. *Wheeler,* 435 U.S. at 326, 98 S.Ct. at 1087. *See also, Oliphant,* 435 U.S. at 212, 98 S.Ct. at 1022 (1978).

▬ In this case, the Navajo Tribe's sovereignty to regulate oil and gas leases on Tribal lands is not inconsistent with its status as a dependent nation. Even though the tribes are in a dependent position, they continue to possess attributes of sovereignty over both their members and their territory. *Wheeler,* 435 U.S. at 323, 98 S.Ct. at 1086. This includes the power to "regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationship with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. United States,* 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493. *See also, Knight v. Shoshone and Arapahoe Indian Tribes,* 670 F.2d 900, 903 (10th Cir.1982) ("The power to control the use of non-Indian owned land located within the reservation flows from the inherent sovereign rights of self-government and territorial management.").

▬ In the case now under consideration, the plaintiff Arapaho entered into a consensual relationship with the Tribe when it became a party to an oil and gas lease. It voluntarily subjected itself to the inherent sovereignty of the Tribe to regulate that lease. The plaintiff Superior seeks to assert rights it claims to have acquired by assignment from others who have entered consensual agreements with the Tribe. With those rights came the

6. The plaintiffs do not claim that the Tribe's sovereignty to regulate leases has been diminished by treaty.

obligation of being subject to the inherent sovereignty of the Tribe over its territory. This sovereignty includes the power to regulate oil and gas leases on Tribal lands.

██ The power to regulate oil and gas leases is also derived from the tribes' inherent "power to exclude" nonmembers from tribal land. *Merrion,* 455 U.S. at 144, 102 S.Ct. at 905. The treaty entered into between the United States and the Navajo Tribe in 1868 specifically provided that "no one, except United States Government personnel, was to enter the reserved area." *Williams v. Lee,* 358 U.S. 217, 221, 79 S.Ct. 269, 271, 3 L.Ed.2d 251 (1959). *Cf., Worcester v. Georgia,* 31 U.S. 350, 8 L.Ed. 483 (1832). This power to exclude necessarily includes within it the power to decide whom to exclude, as well as the power to regulate the activities of those the tribe chooses not to exclude. *See Merrion,* 455 U.S. at 144–45, 102 S.Ct. at 905–06.

██ The Tribe did not waive its sovereignty to regulate leases by failing to include in the lease a provision expressly reserving that sovereign power.[7] The Tribe wears two hats: It is both a sovereign power and a landlord. In *Merrion,* the Supreme Court held that the Indian tribe had the power to impose a severance tax on minerals removed from tribal property under lease. The court reasoned that the petitioner's and the dissent's argument that the tribe had waived its sovereignty by failing to expressly reserve those powers in the lease

> confuse the Tribe's role as commercial partner with its role as sovereign. This confusion relegates the powers of sovereignty to the bargaining process undertaken in each of the sovereign's commercial agreements. It is one thing to find that the Tribe has agreed to sell the right to use the land and take from it valuable minerals; it is quite another thing to find that the Tribe has abandoned its sovereign powers simply because it has not

expressly reserved them through a contract.

*Id.* at 145–46, 102 S.Ct. at 906.

██ The Tribe derives its authority to regulate oil and gas leases not only from its powers to control its territory and to exclude nonmembers from that territory, but also from its powers to protect its political integrity, to protect its economic security, and to preserve the health and welfare of the members of the Tribe. "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana,* 450 U.S. at 566, 101 S.Ct. at 1258. *See also, Babbitt Ford, Inc. v. Navajo Indian Tribe,* 710 F.2d 587, 592–93 (9th Cir.1983), *cert. denied,* — U.S. — 104 S.Ct. 1707, 80 L.Ed.2d 180 (1984); *Knight,* 670 F.2d at 903–04.

In *Montana,* the Supreme Court held that the Crow Tribe could exclude nonmembers from hunting and fishing on Tribal land, and that the Tribe could condition permission to hunt or fish by charging a fee and enforcing other regulations. However, the Court also ruled that the Tribe could not regulate hunting and fishing by non-Indians on non-Indian land, even though that land was within the reservation. The Court reasoned that hunting and fishing by non-Indians on land owned by non-Indians did not threaten "the Tribe's political or economic security as to justify tribal regulation." 450 U.S. at 566, 101 S.Ct. at 1259. The Court also reasoned that the non-Indians' hunting and fishing for sport did not "imperil the subsistence or welfare of the Tribe." *Id.*

██ The conduct that the plaintiffs here assert is beyond the Tribe's sovereignty is directly related to the Tribe's economic security. The Tribe derives enormous economic benefits from the sale of its natu-

---

7. The parties vigorously dispute the issue of whether the leases included a provision that allowed the Tribe to approve or disapprove as- signments. Because the resolution of this issue is not necessary to the disposition of this case, the court will not address it.

ral resources. The Tribe would lose some of its economic security if it were unable to regulate the sale of those resources.[8] Simply losing track of who the lessee is could cause economic harm to the Tribe. The Tribe's health and welfare is also at stake. If the Tribe is unable to require a bond from those who propose to perform seismic tests or drill for oil or gas on Tribal lands, and if the Tribe is unable to exclude negligent operators from the reservation, the Tribe's health and welfare would be imperiled. The plaintiffs' position that once the oil companies obtain a lease from the Tribe, they can proceed to extract minerals from the land without being subject to Tribal regulation simply poses too many risks to the members of the Tribe.

■ Accordingly, the Navajo Tribe retains the inherent sovereignty to determine whether to issue a seismic permit to lessees. The Tribe also retains the inherent sovereignty to approve and disapprove assignments of leases and operating rights. That sovereignty has not been limited by statute or treaty; it has not been diminished as a necessary consequence of the Tribe's dependent status.

### B. The Tribal Officials Authority.

■ The plaintiffs next argue that even if the Tribe has the sovereign power to authorize the Tribal officials to approve assignments and requests for seismic permits, the Tribe has not done so. This argument is also without merit. In a resolution passed on December 16, 1983, the Navajo Tribal Council defined the procedure for transferring mineral interests in Navajo lands. Paragraph (5) of the resolution provides in pertinent part that an assignment of any mineral interest "shall not be effective until approved by the Chairman, Navajo Tribal Council, on behalf of the Navajo Tribe." This resolution delegated authority to the individual defendant Peterson Zah, Chairman of the Navajo Tribal Council, to approve the assignments at issue in this case.

The plaintiffs argue that if the Chairman has authority from the Tribe to approve any assignments, he *must* approve all assignments. The December 16, 1983, resolution does not support the plaintiffs' position. Paragraph (9) of the December 16, 1983, resolution indicates that approving such assignments involves the exercise of discretion:

No assignment or transfer of any interest in any ... operating [agreement], ... lease or other agreement ... shall be approved by the Navajo Tribe prior to an evaluation and determination by the Minerals Department of the Navajo Nation that such assignment is in the economic interests of the Navajo Tribe.

In light of this provision, the court rejects the plaintiffs' contention that the Chairman *must* approve all assignments. Even if that were true, the plaintiffs have not alleged that they have followed the procedures set forth in the resolution.[9] Absent

8. Allowing the Tribe to regulate its oil and gas leases is consistent with the "general federal policy of encouraging tribes to 'revitalize their self-government' and to assume control over their 'business and economic affairs.'" *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 149, 100 S.Ct. 2578, 2586, 65 L.Ed.2d 665 (1980), quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114 (1973).

More recently, the Supreme Court has stated that

both the tribes and the federal government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes. We have stressed that Congress' objective of furthering tribal self-government encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging "tribal self-sufficiency and economic development." In part as a necessary implication of this broad federal commitment, we have held that the tribes have the power to manage the use of its territory and resources by both members and non-members.

*New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 103 S.Ct. 2378, 2386–87, 76 L.Ed.2d 611 (1983), quoting *Bracker,* 448 U.S. at 143, 100 S.Ct. at 2583 (citations omitted).

9. For example, the resolution provides for full and complete disclosure of the terms of the assignment and for payment of a filing fee. The resolution also gives the Tribe a right of first refusal on all assignments.

such compliance, the Chairman is not empowered to approve any assignments.

■ The Tribe has also empowered the Chairman to approve requests for seismic permits. Title 16 N.T.C., § 652 provides as follows:

Oil and gas prospecting permits without preference to lease may be issued for areas requested, but in no case for a larger area than a land management district. These permits may be granted by the Chairman of the Tribal Council with the consent of a majority of the district councilmen from the district concerned and the approval of the General Superintendent.

The plaintiffs assert that the language "without preference to lease" must be interpreted to mean that § 652 does not apply to lands under lease. If the plaintiff is correct, then § 654 grants authority to the Chairman to approve seismic permits:

The Advisory Committee shall consider all other requests for permits and the Chairman of the Tribal Council, with approval of the Advisory Committee, shall have authority to grant permits for exploration, prospecting, and other activities not otherwise provided for by Council action, with the approval of the General Superintendent.

The Preamble to the resolution that enacted these sections indicates that the Tribe was receiving requests for permits of various types and was concerned about the orderly development of all Tribal resources, not merely the ones not under lease.[10] The plaintiffs' assertion that a permit is necessary only to explore on lands not under lease is incompatible with the concern voiced by the Tribal Council.

■ The court also rejects the plaintiffs' alternative argument that the Chairman *must* approve all requests for permits.

Both sections 652 and 654 provide that permits *may* be issued. That language does not contemplate that the approval of requests for permits be mandatory. However, even if the approval is mandatory, the plaintiffs have not alleged that they have complied with the requirements of § 656.[11]

■ The court concludes that the Tribe has empowered the Chairman to do the acts complained of in the complaint. Because the Tribe has the inherent sovereignty to authorize him to do those acts, his acts are considered acts of the sovereign. The Tribe's sovereign immunity prevents this court from asserting jurisdiction, and the complaint against Peterson Zah, Chairman of the Tribal Council, must be dismissed.

■ The complaint against the remaining individual defendants should be dismissed as well. These individual defendants point to no specific resolution or provision of Tribal law that entitles them to act on behalf of the sovereign. However, even if the court assumes that they have acted beyond their authority, there is no relief available that would satisfy the plaintiffs. The plaintiffs seek only injunctive relief. The court cannot order the remaining individual defendants to approve a seismic permit because such an order would, in effect, be relief against the sovereign. Any other injunctive relief would be no relief at all.

### III. THE UNITED STATES DEFENDANTS

■ Finally, the complaint against the United States defendants must also be dismissed. The United States takes the position that it is without authority to grant seismic permits. The government contends that the plaintiffs may enter the Tribal lands to perform seismic testing without any permission whatsoever from the Unit-

---

**10.** The Preamble provides in pertinent part as follows:

Whereas: ...
(3) Due to the great interest in oil and gas, uranium, and other mineral resources on Tribal lands, the requests for permits of various types are numerous and frequent, and

(4) It is of great importance to proper and orderly development of Tribal resources that a proper procedure be set out for processing and handling these permit requests.

**11.** Section 656 provides for the posting of a $5,000 bond and the payment of a small fee.

ed States, so long as their leases are valid. Given this position of the United States, there is no case or controversy involving the United States defendants.

### IV. CONCLUSION.

Reduced to its essentials, the plaintiffs are complaining that the Tribe, as sovereign, is abusing its status as sovereign to obtain an unfair advantage for its status as landlord. The question then is whether the tribal court or a United States district court initially has power to hear such a claim. Under the statutes and cases as this court reads them, Congress has placed that initial determination with the tribal court. The appropriateness of that fact and that sequence results from congressional choice. This court's recognition of that fact and sequence controls the outcome of this case.

Accordingly, the defendants' Motion for Summary Judgment and the defendants' Motions to Dismiss should be granted. The complaint against all of the defendants should therefore be dismissed.