**CHUSKA ENERGY COMPANY, a corporation, and H.M. Bettis, an individual, Plaintiffs,**

v.

**The SUPERIOR OIL COMPANY, a corporation, Defendant.**

**Civ. A. No. H–84–3993.**

United States District Court,
S.D. Texas,
Houston Division.

April 30, 1987.

---

Thomas A. Brown, Brown, Sims, Wise & White, Houston, Tex., Paul F. Cronin, Cronin, Fried, Sekiya & Kekina, Honolulu, Hawaii, for plaintiffs.

Roxanne Armstrong, Baker, Brown, Sharman & Parker, Houston, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

HITTNER, District Judge.

### I. *Statement of the Case*

This lawsuit is the culmination of an oil and gas deal which collapsed when the parties' original expectations and goals changed during year-long negotiations. The allegations of breach of contract involve numerous transactions and individuals including all parties to this lawsuit, employees, government officials, and the Navajo tribe. The issues necessarily require the recounting of many facts and occurrences. In ruling on a Motion for Summary Judgment, the Court will resolve any doubt concerning issues of material fact in favor of the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir.1981); *Pitt v. Shell Oil Co.*, 463 F.2d 331, 335 (5th Cir.1972). We therefore consider the facts in the version most favorable to the Plaintiffs, Chuska Energy Co. (Chuska) and H.M. Bettis (Bettis).

In September, 1981, Chuska entered into an oil and gas operating agreement involving approximately 167,000 acres of Navajo land. Chuska's Response in Opposition to Superior's Motion for Summary Judgment, Ref. 16 (hereinafter referred to as "Chuska's Response"). Although this agreement was originally drafted by Superior Oil Company (Superior), it was then submitted to Chuska and Chuska's attorney for their use in finalizing the transaction with the Navajos. Chuska's Response, Ref. 7. Chuska submitted an edited and retyped version of the Operating Agreement to the Navajo Tribe. *Id.* Both the Navajo Tribe and Chuska approved and signed the Operating Agreement on September 18, 1981. Chuska's Response, Ref. 16.

As early as July, 1981, and well before the Operating Agreement was signed, Superior was aware of Chuska's proposal to the Navajos. Mike Bettis, who was recently retired from his position as Superior's Senior Landman and who is also a Plaintiff in this lawsuit, was keeping Superior informed on Chuska's negotiations with the Navajos. Chuska's Response, Affidavit of Henry Mike Bettis, Exhibit C at 3. Superior had been interested in acquiring operating rights to the Navajo lands at least since 1977, Chuska's Response, Affidavit of Eugene Hixon, Ref. 2, and Bettis acted as a land broker in bringing Chuska and Superior together to negotiate an assignment of some of the Navajo oil and gas operating rights.

One week after the Operating Agreement was signed by Chuska and the Navajos, Chuska and Superior entered into the assignment agreement (Assignment Contract), which is the subject of this lawsuit. The contract proposed the assignment to Superior of a portion of the Navajo acreage described in the Operating Agreement. The Assignment Contract set terms and conditions under which Chuska would assign to Superior 100,000 acres of Superior's choice in exchange for Superior's payment of $16 million. Chuska's Response at 3–4. The Assignment Contract contained provisions governing (1) certain approvals required for the Operating Agreement and the Assignment Contract, and (2) the parties' obligations if the Department of the Interior (Interior) required changes in the Operating Agreement. The Assignment Contract was signed by Superior and Chuska on September 25, 1981.

In late September, 1981, Chuska submitted the Operating Agreement to Interi-

or to obtain its approval as required by the Assignment Contract. Interior requested several changes in the Operating Agreement as conditions on its approval of the Assignment. Superior then assisted Chuska in its endeavors to prepare an addendum which would satisfy Interior. Chuska asserts, and we will assume in its favor, that Superior was very involved in these negotiations. To support its contention, Chuska states that in early December, 1981, "Superior used its company plane to fly Mr. Bass (Chuska's attorney), Mr. Manuelito (President of Chuska Energy Co.), Mr. Beerbower (Superior's in-house counsel), and Mr. Hixon (Superior's in-house landman) to Washington for meetings with Interior." Chuska's Response at 4. The work on the addendum culminated in the submission to Interior of an April 21, 1982, Addendum (hereinafter referred to as "First Addendum").

On July 16, 1982, Interior notified Chuska by letter that Interior would approve the Operating Agreement with the First Addendum, pending an environmental assessment. Chuska's Response, Ref. 9. On September 2, 1982, Hixon, Vice President, Superior Oil Company, wrote a letter to Bettis, in which he reminded Bettis that the approval on the July 16 letter did not meet the requirements for approval as set forth in the Assignment Contract.

Because of the September 2 letter and other communications with Superior, Bass, Chuska's attorney, was becoming increasingly concerned that Superior no longer wanted the acreage assignment. On September 14, 1982, Bass sent Superior a letter which asked whether Superior planned to accept or reject the changes embodied in the First Addendum, and requested a response within five days. Chuska's Response, Ref. 14. This letter from Bass referred to Paragraph 9 of the Assignment Agreement which contained a clause permitting Superior to terminate the Operating Agreement if alterations required by Interior would "materially affect Superior's rights or obligations" under the Assignment Agreement. Superior's Motion for Summary Judgment, Exhibit B. Superior responded with a letter the following day. This September 15 letter expressed Superior's conclusion that the changes in the First Addendum *were* material and that Superior intended to exercise its option to terminate the Operating Agreement under Paragraph 9.

Interior gave its full approval to the Operating Agreement, as amended by the First Addendum, on September 28, 1982. Under the terms of the Operating Agreement, Chuska had ninety days from that date to pay $7,000,000 to the Navajo Tribe. Chuska did not have the money. When Chuska realized that Superior did not intend to accept the Assignment, Chuska searched in vain for other potential assignees. Chuska obtained an extension of the payment deadline in the form of a December 30, 1982, Addendum (Second Addendum) approved by the Navajo Tribe. Chuska was never able to pay the Navajos under the Operating Agreement. However, further negotiations did lead to a different operating agreement which was signed by Chuska and the Navajo Tribe on July 28, 1983, and covered only 120 acres.

## II. *Summary Judgment Issues*

A court may grant summary judgment only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of proof is on the movant, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Pitt v. Shell Oil Co.*, 463 F.2d 331, 335 (5th Cir.1972). We have examined the following issues which bear on the outcome of this case and have determined that the Defendant is entitled to summary judgment as a matter of law.

## A. *Legality of the Operating Agreement*

One of the issues in this case is the legality of the Operating Agreement. Superior alleges in Paragraph VI(a) of Superior's First Amended Answer that Superior has no obligation under the Assignment Contract because the underlying Operating Agreement "was an illegal agreement in violation of the then existing law 25 U.S.C. 396a *et seq.*" These sections of Title 25

impose requirements on lease and operating agreements which affect Indian lands. The Operating Agreement, one of the contracts which lies at the heart of this breach of contract action, does involve Indian lands, and is therefore subject to Title 25 restrictions. Interpretation and application of Title 25 to the Operating Agreement form the basis of this Court's federal question jurisdiction. For purposes of ruling on Superior's Summary Judgment Motion, the Court will presume the legality of the Operating Agreement and will assume that Superior is estopped to deny the legality of that Agreement. The Court need not reach the federal question.

## B. Breach of Contract

### 1. Conditions Precedent

Count I of Chuska's complaint alleges that Superior breached the Assignment Contract. To determine whether a breach occurred, the Court must construe the contract. Ambiguous contracts present genuine issues of material fact which must be resolved at trial. However, determination of contract ambiguity is a question of law.[1] This Court has examined the C–S Agreement, and finds that it is a fully integrated, unambiguous contract.

Paragraph two (2) of the C–S Agreement states:

*When and if* the Secretary shall approve both the Operating Agreement and the Assignment [the Assignment Contract] and the Operating Agreement shall have been executed by the Chairman of the Navajo Tribal Council on behalf of the Navajo Tribe of Indians and its Tribal Council and by Assignors and each of them, *then and thereupon the provisions of Paragraph 3 through 13 of this Agreement shall become effective and binding on the parties.* In the event the Secretary shall approve the Operating Agreement but declines to approve the Assignment, then the parties hereto agree that they shall make all reasonable effort to have the same approved, provided that if the same is not approved within thirty (30) days after such denial of approval, this Agreement shall be of no further force or effect absent some other agreement between the parties.

Superior's Motion for Summary Judgment, Exhibit B (emphasis added).[2] Paragraph 1 defines "the Secretary" as "the Secretary of the Interior of the United States or the Assistant Secretary for Indian Affairs." *Id.*

---

1. Although Chuska chose to file its suit against Superior in Texas state court (from which it was removed to federal district court), Chuska argues that "[i]t is by no means clear that Texas law applies to the contract which forms the basis of this lawsuit." Chuska argues further that the choice of law issue must be briefed and argued before it can be decided. Even if we assume in Chuska's favor that choice of law has not yet been decided, we cannot agree with Chuska that the choice of law issue precludes summary judgment in this case. Under federal law, and under the substantive law of each state mentioned by Chuska, the rule is the same. Determination of whether a contract is ambiguous is a question of Law. *Thornton v. Bean Contracting Co.,* 592 F.2d 1287, 1291 (5th Cir. 1979); *First National Bank v. Insurance Co. of N. Am.,* 495 F.2d 519, 522 (5th Cir.1974); *Hadley v. Southwest Properties, Inc.,* 116 Ariz. 503, 570 P.2d 190, 193 (1977); *Crank v. Nevada Indus. Comm'n,* 100 Nev. 80, 675 P.2d 413 (1984); *Shaeffer v. Kelton,* 95 N.M. 182, 619 P.2d 1226, 1229 (1980); *Overson v. United States Fidelity & Guar. Co.,* 587 P.2d 149, 151 (Utah 1978).

2. Superior's Exhibit B is a copy of the Assignment Contract—the subject of Chuska's breach of contract action. Although Chuska has not provided the Court with a copy of this Assignment Contract, Chuska would have the Court reject Superior's exhibits. In Chuska's Response, Chuska argues that "Superior has failed to authenticate properly the exhibits and deposition extracts which it wishes the court to consider...." Chuska's Response at 13. However, we find that Chuska has adopted Superior's Exhibit B in another section of its response:

This is a suit for breach of a contract entered into among a New Mexico corporation (Chuska Energy and Petroleum Company, Inc.—Plaintiff's former name), a New Mexico partnership (Chuska Exploration), and a Nevada corporation (The Superior Oil Company), covering an assignment of oil and gas operating rights on tribal lands of the Navajo Indians located within the geographic boundaries of the state of Utah. [*See the Chuska-Superior Contract made Exhibit B to Superior's Motion.*]

Chuska's Response at 20 (emphasis added).

By describing the Assignment Contract and incorporating Superior's Exhibit B, Chuska has waived its right to object to the authenticity of that document.

■ Superior asserts that Paragraph 2 creates three conditions precedent to the agreement: (1) that the Secretary approve the Operating Agreement, (2) that the Secretary approve the Assignment Contract, and (3) that the Chairman of the Navajo Tribal Council (hereinafter referred to as "Chairman") execute the Operating Agreement. Under Superior's construction of the Assignment Contract, all three of these conditions must be met before the remainder of the contract (paragraphs 3 through 13) becomes binding. We agree. The language of Paragraph 2 is clear upon its face and no other language in the contract conflicts with it. Thus, if required approvals have not been obtained, paragraphs 3 through 13 of the Assignment Contract have never become effective, and Superior was never bound to accept the assignment from Chuska. In the absence of fulfillment of the conditions precedent, Superior's failure to comply with Paragraphs 3 through 13 does not constitute breach.[3]

a. *Approval of the Operating Agreement by the Secretary*

The Operating Agreement was never approved in its original form by the Secretary. The original Operating Agreement as amended by an April 21, 1982, Addendum (First Addendum) was under consideration by the Department of the Interior during the Summer of 1982. By letter,

dated July 16, 1982, the Deputy Assistant Secretary-Indian Affairs stated that the Operating Agreement was approved "subject to our findings and conclusions of the environmental assessment...." Superior's Motion for Summary Judgment, at 8 & Exhibit F.[4] Chuska admits that this letter constituted the "likelihood of approval," and that "actual approval took place just thirteen days after Superior sent its letter of September 15...." Chuska's Response at 26. Thus, the first condition precedent—that "the Secretary" approve the Operating Agreement—took place on or about September 28, 1982. *See also* Superior's Motion for Summary Judgment, p. 12.

b. *Approval of the Operating Agreement by the Navajo Tribal Council Chairman*

The original Operating Agreement was approved by a tribal Resolution and signed by the Chairman on September 18, 1981. Superior's Motion for Summary Judgment, Exhibit N; Chuska's Response at 3. The Navajo Tribe had not executed the Operating Agreement, as amended by the First Addendum, by the time the Secretary gave approval on September 28, 1982.

On December 30, 1982, the Navajo Tribal Council enacted Resolution CD–91–82, which was signed by the Chairman and which ratified and adopted the Operating Agreement as amended by the First Adden-

---

3. This is the law in each of the states mentioned in Chuska's choice of law argument. *McCorquodale v. Holiday, Inc.,* 90 Nev. 67, 518 P.2d 1097, 1098 (1974) (the purpose and legal effect of a condition precedent is "to narrow the promisor's obligation so that he will not have to perform if the event fails and can never happen."); *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976) (Conditions precedent are those acts which must occur before there is a right to immediate performance and a breach of contractual duty.); *Welch Transfer and Storage, Inc. v. Oldham,* 663 P.2d 73, 76 (Utah 1983) ("Where fulfillment of a contract is made to depend upon the act or consent of a third person over whom neither party has any control, the contract cannot be enforced unless the act is performed or the consent given.")

"If an agreement is made subject to consent of an additional party, it must be viewed as conditional and if the consent is not given, the agreement is not binding." *Watts v. Hogan,* 111 Ariz.

536, 534 P.2d 741, 743 (1975); *Wyrsch v. Milke,* 92 N.M. 217, 585 P.2d 1098, 1101 (1978) (citing *Watts v. Hogan,* 534 P.2d at 743). This rule governs contracts which require consent of another party to the contract. We find that it also applies to the facts of the case before this Court. Although the Secretary was not to be a party to the contract, the Assignment Contract was unambiguously "made subject to consent of an additional" entity. Consent of the Secretary, mentioned no less than seven times in the Assignment, was as essential to the effectiveness of the Assignment Contract as if the parties had required the Secretary's signature on the contract itself. Because the consent was not given, *the agreement is not binding.*

4. Exhibit F is adopted by Chuska in Chuska's Response at 26: "[L]ikelihood of approval had already been signaled in July [*see Exhibit F to Superior's Motion* ] ..." (emphasis added). *See also* note 2 *supra.*

dum. Superior's Motion for Summary Judgment, at 12–13 and Exhibit N; Chuska's Response, Ref. 16. Resolution CD–91–82 created some additional approval problems, however, by adopting simultaneously a Second Addendum, which had not yet been reviewed by the Secretary. Thus, the Operating Agreement approved by the Resolution and signed by the Chairman on December 28, 1982, was not the same Operating Agreement approved by the Secretary.

Although the original Operating Agreement was approved with the First Addendum by the Secretary, and with the First and Second Addendums by the Chairman, those officials never approved the same document. Even if the Court assumes that these approvals met two of the conditions precedent, the third required approval, the Secretary's approval of the Assignment Contract, was never obtained.

### c. *Approval of the Assignment Contract by the Secretary*

The Assignment Contract was never submitted to the Department of the Interior for approval. Chuska does not even argue that the Assignment was ever submitted or approved. Under Paragraph 2 of the Assignment Contract, this approval was a required condition precedent to Superior's obligation to perform under paragraphs 3 through 13. In Paragraph 2 the parties clearly stated their intention that the Assignment shall have "no further force or effect" if the Secretary approves the Operating Agreement, but *declines* to approve the Assignment. The parties specifically required this approval, which was never sought by Chuska.

### 2. *Superior's Performance Under Paragraphs 3–13*

 We do not find that Superior was bound to perform the obligations they would have incurred if Paragraphs 3–13 had become effective. However, even if Superior were so bound, we find that Superior was not in breach of the Assignment Contract.

### a. *Paragraph 3*

Under Paragraph 3, approval of the Assignment by the Secretary was once again clearly stipulated as a condition precedent to Superior's obligation to pay Chuska. Paragraph 3 states:

*After the Secretary has approved* the Operating Agreement *and the Assignment* as heretofore provided, *and upon execution of all the documents as provided in [Paragraph] 2. above* ... the Assignment shall become effective and Superior shall, within five days *following receipt of written notice of such approval,* pay to Assignors jointly the sum of Eleven Million Dollars ($11,000,000.00). In addition to the Eleven Million Dollars ($11,000,000.00) heretofore provided, Superior hereby agrees to pay to Assignors the additional sum of Five Million Dollars ($5,000,000.00) ninety (90) days *after the date on which the Assignment is approved by the Secretary....*

Superior's Motion for Summary Judgment, Exhibit B (emphasis added).

Under this provision, the Secretary's approval of the Assignment Contract must be obtained before the Assignment becomes effective and before the $11 million becomes due to Chuska. An additional $5 million is not due until ninety days after both approval by the Secretary and written notice by Chuska. Neither the notice nor the approval was given. Therefore, the Assignment never became effective and Superior incurred no obligations under Paragraph 3. In the absence of a binding obligation to pay the amounts listed in Paragraph 3, Superior's failure to pay does not constitute breach.

### b. *Paragraph 9*

Paragraph 9 describes what Superior's rights and obligations would be if the Secretary requires an alteration in the Operating Agreement or Assignment prior to giving approval. Because the Assignment Contract was never submitted to the Secretary, the parties do not know whether alterations to the Assignment would have been required. However, the Secretary did require alterations in the Operating Agree-

ment. In a July 16, 1982, letter from the Department of the Interior, the Deputy Assistant Secretary-Indian Affairs discussed the Second Addendum. "We have also reviewed the changes to the agreement which we required as set forth in the addendum of last April. *We could not have considered the agreement without the changes.*" Superior's Motion for Summary Judgment, Exhibit F; *see* note 3, *supra.*

Had Paragraphs 3 through 13 been in effect, the Interior's request for the changes (incorporated into the Operating Agreement by the First Addendum) would have triggered Paragraph 9, which states:

> If the Secretary shall require an alteration or alterations in the Operating Agreement or the Assignment, or require alteration of the form of the transaction prior to approval thereof which alteration does not affect in any way the rights and obligations to be assigned to Superior under the terms of this Agreement, and Assignors accept such alterations, then Superior shall be bound by the terms hereof as though no alteration had been made.

Superior's Motion for Summary Judgment, Exhibit B; *see* note 2, *supra.* In other words, the parties agreed that alterations having no effect on Superior's rights and obligations would not affect the terms of the Assignment Contract.

Chuska argues that the First Addendum contained only nonmaterial alterations and did not materially affect Superior's rights and obligations. If the Court assumes in Chuska's favor that the First Addendum "does not affect in any way" Superior's rights and obligations, then the above-cited language in Paragraph 9 is pertinent.[5] Enforcement of this provision of Paragraph 9 requires only that "Superior shall be bound by the terms hereof as though no alteration had been made." This provision does not change any of Superior's obligations under the Assignment Contract; it does not waive the conditions precedent.

We have already determined that Superior satisfied any obligations it incurred under the Assignment Contract. Superior had no obligation to pay Chuska because, under Paragraph 3, the conditions precedent which would trigger Superior's obligation to pay Chuska had not been met.

Furthermore, Superior did not yet have an obligation to begin oil and gas exploration because Superior's exploration and drilling obligations are also subject to the conditions precedent. Paragraph 4 of the Assignment Contract states: "Upon the Assignment becoming effective, Superior ... agrees that it will commence exploration operations...." Recall that under Paragraph 2, "when and if the Secretary shall approve both the Operating Agreement and the Assignment and the Operating Agreement shall have been executed by the Chairman ... then and thereupon the provisions of paragraph 3 through 13 of this Agreement *shall become effective* ...." In summary, even if the changes in the First Addendum were not material, Paragraph 9 does not waive the conditions precedent or bind Chuska to any obligation independent of the rest of the Assignment Contract.

Entwined with Chuska's argument that Superior could not terminate the Assignment under Paragraph 9 (because the First Addendum contained only nonmaterial changes), is Chuska's alternative argument concerning Superior's attempt to exercise the Paragraph 9 termination option. Chuska argues that Superior's failure to mention conditions precedent in their September 15, 1982, letter constitutes a waiver of Superior's right to assert failure of a condition precedent. Chuska states that Superior "did not treat the lack of approval by the Secretary ... as failure of a condition precedent." Chuska's Response at 23. That letter does purport to terminate the assignment pursuant to Paragraph 9; however, the letter is in response to Chuska's letter written just one day earlier (September 14, 1982), which *required* Superior's

---

**5.** Other language in Paragraph 9 pertains to the rights and obligations of the parties if the changes *are* material.

decision on the materiality of the changes. Chuska's letter, written by their attorney states:

> Notwithstanding our opinion that the changes set forth in the addendum do not constitute in any instance a material alteration to the Operating Agreement; we do feel compelled in view of paragraph 9 ... to call these changes to your attention. Should Superior be of the opinion that the changes required to be made as aforesaid do materially affect its rights or obligations under the terms of the [Assignment] ..., then we shall expect written notification from Superior within five days hereof of its decision whether to accept or reject the amendments to said Agreement. If written notice is not received ... then Chuska shall assume ... that Superior concurs with Chuska's opinion that the aforesaid alterations to the Agreement do not materially affect Superior's rights and obligations.

Chuska's Response, Ref. 14. If Superior had not responded, quite likely Chuska would now be arguing that Superior's silence was an admission that the changes were not material. This Court views Superior's response as a preservation of its right to exercise the Paragraph 9 option to terminate the assignment if the Secretary required material alterations.

The option to terminate, which Superior reserved for itself, is contained in the second sentence of Paragraph 9 and is applicable only if the changes required by the Secretary did "materially affect Superior's rights or obligations" under the Assignment. This option to reject material changes under Paragraph 9 states:

> *If the Secretary shall require alteration* or alterations in the Operating Agreement or the Assignment or require alteration of the form of the transaction prior to approval thereof *which alteration* or *alterations materially affect Superior's rights or obligations hereunder* which alterations are acceptable to Assignors, *then Superior shall have the option but not the obligation to accept such alterations* by written notice to Assignors to that effect within five days after it has been notified in writing of such requirement *or to reject such alterations and thereby have no further obligations hereunder.*

Superior's Motion for Summary Judgment, Exhibit B (emphasis added).

■ Although we have assumed in Chuska's favor that the alterations were not material and that Superior did not have the right to terminate the Assignment by exercising the Paragraph 9 option, the Court finds that the alterations contained in the First Addendum were in fact material.[6] Chuska argues that this materiality is a fact issue and cannot be decided on summary judgment. However, the party moving for summary judgment can discharge his burden of proving no material issue of fact by demonstrating that if the case went to trial, no competent evidence exists to support a judgment for his opponent. The test is whether "the court believes that reasonable men could not arrive at but one verdict." *Nunez v. Superior Oil Co.,* 572 F.2d 1119 (5th Cir.1978). We find that no reasonable men could find the alterations of the First Addendum to be immaterial.

Superior asserts that the First Addendum affected twelve substantive changes in the Operating Agreement. Among these changes are included: (1) a shortening of the primary term from twenty-five to ten years, Chuska's Response, Ref. 6, Operating Agreement at 9, Addendum at 5; (2) addition of a clause which would require Superior to recognize the "power of the Navajo Tribal Council" to enact and promulgate laws—an issue which Superior was then litigating in federal court, *Superior Oil Co. v. United States,* 605 F.Supp. 674 (D.Utah 1985), *reversed* 798 F.2d 1324

---

**6.** Chuska suggests that the Court should apply the "test of materiality" from section 2–207 of the Uniform Commercial Code to determine whether the Second Addendum affected Superior's rights and obligations. The test is whether the additional clauses involve "surprise or hardship." U.C.C. § 2–207, Comments 4 & 5. Although this contract does not involve the sale of goods, and is therefore not governed by the U.C.C., the Court will agree with Chuska for purposes of ruling on this Summary Judgment Motion.

(10th Cir.1986); Chuska's Response, Ref. 6, Addendum at 6; (3) elimination of the Navajo's obligations to cooperate in restructuring the transaction for advantageous tax treatment, Superior's Motion for Summary Judgment, Exhibit E at 7;[7] and (4) a reduction in the number of acres to be operated by Superior, Chuska's Response, Ref. 6, Addendum at 2.

We find that each of the four changes cited above affects Superior's property rights under the Assignment Contract and Operating Agreement and therefore constitutes alterations which "materially affect Superior's rights" and thus are material under Paragraph 9. Even under Chuska's "surprise or hardship" test, the changes are material. The changes which require Superior to recognize the Navajo's authority to enact laws, is a power which Superior was at that time contesting in the courts. Agreeing to a provision which unnecessarily subjects Superior to undesirable laws or would require future litigation is undeniably a hardship.

Chuska dedicates almost two-thirds of its brief to the argument that materiality of the changes in the Second Addendum is a question of fact, and that Superior has failed to establish the materiality of any changes. Chuska bases its argument partly on Superior's acquiescence in those changes. "Throughout 1981 and 1982 Superior knew of and approved of the amendments and at no time raised any objections until their September 15, 1982, letter." Chuska's Response at 35. However, a change which seems immaterial at one time, may become more significant as economic conditions change.

For example, one of the changes concerned "nonrecoupable royalties." Chuska's Response at 44. Instead of arguing that the change in royalty payment was immaterial, Chuska argues that at one time the change was not significant enough to warrant exercise of a Paragraph 9 termination. "Superior had already demonstrat-

ed its willingness to pay such sums in its own proposal to the Navajos ... dated July 27, 1979...." *Id.* at 44. This argument presents some logical inconsistencies. First, Superior was willing to pay these sums under a totally different proposal, whose terms may have provided other benefits which would compensate for the payments. Second, Superior's relationship with the Navajos had deteriorated considerably between 1979 and late 1982. By September, 1982, the Navajos were refusing to grant drilling permits or to provide local cooperation in areas where Superior was attempting to develop previously acquired mineral rights. *Id.* at 31–35. Just because Superior was willing to pay the "nonrecoupable royalties" in another contract which was offered two years previously, does not mean that the added financial burden under the Assignment Contract would be immaterial.

In essence, Chuska is arguing that Superior did not think the changes were important until September, 1982, when they no longer wished to acquire operating rights on additional Navajo land. However, this argument does not convince the Court that the changes were immaterial from their inception. Prior to September 15, 1982, Superior was apparently willing to accept the changes and to decline the exercise of its option to terminate under Paragraph 9. This does not mean, however, that Superior had waived its right to exercise the option. Pursuant to Paragraph 9, Superior had the right to change its mind and exercise the termination and any time up to five days after it received written notice to accept or reject the changes. If Superior misled Chuska into believing that it would not exercise the option, this may give Chuska a cause of action in misrepresentation or fraud. Such action by Superior does not alter the fact that the First Addendum contained changes which substantially affected Superior's rights and obligations, and were therefore material.

---

**7.** Although Chuska contests the authenticity of this exhibit, Chuska's Response, Ref. 6, contains the same Addendum document as Superior's Exhibit E. Chuska's version, however, is miss-

ing page four which contains the language concerning restructuring for advantageous tax treatment.

Thus, we find that Superior had a right under the Assignment Contract to exercise the Paragraph 9 option to terminate the agreement. However, as noted above, we need not even reach this issue to find that Superior's motion for summary judgment should be granted. The Assignment Contract is unenforceable without Superior's having to exercise this termination option, because the conditions precedent to Superior's performance obligation never occurred.

### 3. *Anticipatory Repudiation*

■ Chuska argues that Superior's letter of September 15, indicating Superior's intent to exercise the Paragraph 9 option to terminate, constituted anticipatory repudiation, and "left Chuska unable to perform, once the Operating Agreement was finally approved on September 28, 1982." Chuska's Response at 49. Whether or not the letter from Superior affected Chuska's *ability* to perform, that letter does not subject Superior to liability for breach under the doctrine of anticipatory repudiation. Generally, anticipatory repudiation will excuse the nonoccurrence of a condition precedent. Restatement (Second) of Contracts § 255 (1977). Where one party clearly intends to breach, fulfillment of conditions precedent should be excused because "[n]o one should be required to do a useless act." *Id.* comment a. However, Superior's intent to terminate under Paragraph 9 is not repudiation. Repudiation is "a statement by the obligor ... indicating that the obligor will commit a breach which would of itself give the obligee a claim for damages for total breach." Id. § 250. Superior's intent to exercise a valid contract option cannot be construed as an intent to breach the Assignment Contract, and exercise of the option would not have given Chuska a claim for damages for breach. This Court finds that Superior's letter of September 15 did not state its intent to breach the contract, but merely informed Chuska of Superior's intent to exercise a right which both parties had recognized. "Repudiation by one party, to be sufficient in any case to entitle the other to treat the contract as absolutely and finally broken and to recover damages as upon total

breach, must at least amount to an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his obligation." *Mobley v. New York Life Ins. Co.,* 295 U.S. 632, 638, 55 S.Ct. 876, 878, 79 L.Ed. 1621 (1935). In *Mobley,* the Court found that the insurance company's good faith refusal to pay benefits, as a result of their attempt to follow, though erroneously, the disability clause of the contract, did not amount to repudiation. We hold that Superior's statement of intent to exercise the Paragraph 9 option did not constitute anticipatory repudiation.

### C. *Superior's Motion for Summary Judgment Against Bettis*

Mr. Bettis, the retired Superior landman who acted as a land broker to bring Superior and Chuska into the negotiations, has sued Superior for $500,000—the commission he lost "by way of Superior's breach." Plaintiff's Original Complaint, Paragraph 36. Thus, the basis for Bettis's complaint is Superior's alleged breach of the Assignment Contract. For the reasons set forth above, this Court finds that Superior did not breach the contract and that Bettis's cause of action based on breach of contract is therefore dismissed.

### III. *Pendent State Claims*

In addition to the breach of contract actions which, had a valid contract existed, would have involved a federal question, Chuska and Bettis have also alleged Superior's "deliberate, deceitful, malicious and fraudulent conduct" in misleading Chuska and Bettis into thinking it would perform under the Assignment Contract despite the material changes and the lack of approvals. While this Court has discretion to exercise pendent jurisdiction over these state claims, this Court is of the opinion that dismissal of the state claims is proper pursuant to *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1955). As stated in *Gibbs,* "if the federal claims are dismissed before trial ... the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139. *See also Ingram v. J. Ray McDermott & Co.,* 698 F.2d 1295, 1317–20 (5th Cir.1983). Because

this Court has dismissed the breach of contract action, the Plaintiff's federal question is moot, and only the state law claims remain. Pursuant to the principles set forth in *Gibbs*, this Court dismisses the Plaintiff's state claims without prejudice.

### ORDER

For all of the above reasons, it is

ORDERED that Plaintiff Chuska's alleged cause of action for breach of contract be DISMISSED WITH PREJUDICE.

It is further

ORDERED that Plaintiff Bettis's alleged cause of action for breach of the Chuska-Superior assignment contract be DISMISSED WITH PREJUDICE.

It is further

ORDERED that the Plaintiff's pendent state law causes of action be DISMISSED WITHOUT PREJUDICE for lack of subject matter jurisdiction.